1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                                * * *

9    GLENN MARR,                        )
                                        )
10                 Plaintiff,           )        03:06-CV-00354-LRH-RAM
                                        )
11   v.                                 )
                                        )        ORDER
12   PETER ANDERSON, CLAIR              )
     MENDENHALL, JOSEPH WULFKUHLE,      )
13   ROBERT ASHWORTH, MICHAEL           )
     DONDERO, PETER CANNIZARRO, ALAN    )
14   BIAGGI, and SIM COM INTERNATIONAL  )
     INC., a Florida corporation,       )
15                                      )
                   Defendants.          )
16   _____)

17          Presently before the court is Defendants Peter Anderson, Robert Ashworth, Michael

18   Dondero, Peter Cannizaro, and Allen Biaggi's (collectively, "Defendants"[1]) Motion for Summary

19   Judgment (#65[2]).  Plaintiff Glenn Marr has filed a response (#76) to which Defendants replied

20   (#79).

21   ///

22   _____

23          [1] The court has previously dismissed the claims asserted against the remainder of the defendants.  On
     August 15, 2007, the court dismissed Plaintiff's claims against Defendant Sim Com (#47), and the Clerk
24   entered judgment (#48) accordingly.  On May 8, 2008, the court granted Defendant Mendenhall and Defendant
     Wulfkuhle's Motion for Summary Judgment (#61).  Although the Clerk entered judgment (#62) with regard
25   to these Defendants, the court later vacated the judgment (#73) to await the adjudication of all claims and
     parties.

26          [2] Refers to the court's docket number.

1       I.      **Facts and Procedural History**

2               Plaintiff filed this action seeking damages arising out of his termination from employment

3       for allegedly exercising his First Amendment right to speech.  During the period relevant to this

4       action, Plaintiff worked as a pilot for the State of Nevada, Department of Conservation and Natural

5       Resources, Division of Forestry.  Defendants are employees of the State of Nevada.  Specifically,

6       Defendant Anderson is the State Forester and Fire Warden for the Division of Forestry.  Defendant

7       Ashworth is currently a Deputy State Forester for the Division of Forestry and during the period

8       relevant to this case was the Program Manager for Fire Management.  In this position, Defendant

9       Ashworth had supervisory responsibility over the aviation program.  Defendant Dondero is the

10      State Fire Management Officer for the Division of Forestry.  Defendant Cannizarro is now retired

11      but, from September of 2002 to May of 2007, was the Conservation Staff Specialist for the

12      Division of Forestry.  Defendant Biaggi is the Director of the Nevada Department of Conservation

13      and Natural Resources.

14              Plaintiff maintains that in early 2005 he learned that the Division of Forestry planned to

15      reduce the number of pilots and the number of pilot hours.  It appears that in early 2005 the aviation

16      program began experiencing monetary problems.  According to Defendant Ashworth, federal

17      legislation and a new contract between the State of Nevada and Southwest Airlines had

18      significantly reduced the demand for administrative flights from the Division of Forestry.  In the

19      past, reimbursements for administrative flight time were crucial to the Division of Forestry's

20      budget.  Defendant Ashworth and Defendant Cannizarro projected that the agency would not be

21      able to keep both Plaintiff and Plaintiff's supervisor, Pat Ross, as pilots year round without

22      additional funds.  Accordingly, Defendant Ashworth met with Plaintiff and Pat Ross to develop a

23      strategy to market administrative flights to other state agencies.  Defendants Ashworth and

24      Cannizarro maintain that their intent was to find a way to continue to employ both pilots and to

25      avoid other reductions in the aviation program.  Contrary to Plaintiff's assertions, Defendants each

26

                                                      2

1  maintain that there was never a plan to reduce the number of pilots or pilot hours.  Instead, they

2  maintain that they worked diligently to keep these assets with the Division of Forestry.

3       Plaintiff asserts that he spoke out to Pat Ross and to Defendants against what he viewed to

4  be a plan to reduce the number of pilots and pilot hours.  Plaintiff maintains that he complained that

5  such a limitation on air resources available to suppress fires was a danger to natural resources and

6  to the lives, safety and property of the citizens of the State of Nevada.  Defendants Dondero,

7  Anderson, and Biaggi deny ever receiving or hearing of such complaints prior to Plaintiff's

8  placement on administrative leave.

9       On June 27, 2005, federal employees, including Defendant Wulfkuhle and Defendant

10  Mendenhall, came to the Division of Forestry's airport in Minden, Nevada to evaluate pilots and

11  aircraft for the upcoming 2005 wild land fire season.  As a part of the inspection, Defendant

12  Wulfkuhle inspected the aircrafts.  During the inspection, Plaintiff approached Defendant

13  Wulfkuhle and asked why the inspections were being conducted because the United States Forest

14  Services had already conducted inspections and approved flight operations.  In response, Defendant

15  Wulfkuhle indicated that pursuant to a policy instituted in August of 2004, the Bureau of Land

16  Management had requested a re-inspection of the aircrafts.  Plaintiff maintains that Defendant

17  Wulfkuhle also stated that Plaintiff's aircraft was being inspected because of unspecified "past

18  problems."

19       Defendants Cannizarro, Dondero, and Ashworth observed the encounter with Defendant

20  Wulfkuhle, and they believed Plaintiff's conduct to be aggressive and unacceptable.  Defendant

21  Ashworth was the first to report the incident to Defendant Anderson.  Defendants Dondero and

22  Cannizarro subsequently submitted statements or spoke directly to Defendant Anderson regarding

23  their observations.

24       The following day, on June 28, 2005, Defendant Anderson placed Plaintiff on

25  administrative leave pending an investigation into Plaintiff's behavior towards Defendant

26       3

1   Wulfkuhle during the June 27, 2005, encounter.  Following Plaintiff's placement on administrative

2   leave, Defendant Anderson formed an investigation team that included Defendant Cannizarro,

3   among others.  During the course of the investigation, inspectors informed Defendant Cannizarro

4   that there were a number of discrepancies with the pilot hours and training records.  Although

5   Defendant Cannizarro recalled Plaintiff attending pilot training at a training center in Orlando,

6   Florida operated by Defendant Sim Com, he found no training records.  Accordingly, Defendant

7   Cannizarro contacted Sim Com to get records of the training.  Defendant Cannizarro then compared

8   the Sim Com record with the time sheets Plaintiff submitted.  He discovered that the training was

9   completed on Friday, but Plaintiff listed eleven hours of overtime on the following Saturday.

10  Defendant Cannizarro also assisted with the summaries of the investigation and in compiling the

11  documents gathered during the investigation.  Ultimately, he presented the report and information

12  to Defendant Anderson.

13          During the investigation, Defendant Mendenhall evaluated pilot flying skills, flight

14  currency, certificates of training, and testing and assessed the capabilities of pilots to perform

15  special mission tasks relating to wild land fire fighting.  Upon an examination of Plaintiff's

16  qualification records, Defendant Mendenhall disapproved the records "due to the inability to

17  accurately verify the flight times . . . until accurate flight times are obtained.  In addition,

18  [Defendant Mendenhall] expressed concern regarding the maintenance of training records . . . and

19  the ability to access training records for verification of training."  (Defs.' Mot. Summ. J. (#65), Ex.

20  13.)

21          On October 10, 2005, Defendant Anderson recommended that Plaintiff be terminated.

22  Defendant Anderson based his decision on what he viewed to be Plaintiff's inappropriately

23  aggressive and confrontational manner towards Defendant Wulfkuhle, Plaintiff's falsification of the

24  number of flight hours on his federal qualification form, and Plaintiff's submission of a false time

25  sheet.

26                                                    4

1    On October 24, 2005, a pre-disciplinary hearing was held.  Defendant Biaggi, as Director of

2   the Department of Conservation and Natural Resources, affirmed the decision to terminate

3   Plaintiff.  He did so based on the investigation, which showed that Plaintiff behaved

4   inappropriately towards Defendant Wulfkuhle, falsified flight hours on his federal flight

5   qualification form, and submitted a false time sheet.

6    Plaintiff administratively appealed the termination decision.[3]  The Nevada Department of

7   Personnel Hearing Officer affirmed the termination.  The Ninth Judicial District Court for the State

8   of Nevada likewise affirmed the termination.  Plaintiff's appeal is now pending before the Nevada

9   Supreme Court.  In the interim, Plaintiff has filed this action asserting First Amendment retaliation

10   claims and conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1988.

11   **II.    Legal Standard**

12    Summary judgment is appropriate only when "the pleadings, depositions, answers to

13   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

14   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

15   law."  Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together

16   with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable

17   to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

18   587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

19    The moving party bears the burden of informing the court of the basis for its motion, along

20   with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*,

21   477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party

22   must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

23   find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

24

25    [3] Although Defendants have not provided any evidence of the appeal, Plaintiff does not dispute
    Defendants' statement of uncontested facts.

26

5

1    1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

2           To successfully rebut a motion for summary judgment, the non-moving party must point to

3    facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

4    *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might

5    affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

6    242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

7    judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute

8    regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

9    return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a

10   scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine

11   dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at

12   252.

13   **III.      First Amendment Retaliation**

14          Plaintiff first claims that by placing Plaintiff on administrative leave and by terminating

15   Plaintiff, Defendants retaliated against him for exercising his First Amendment right to free speech.

16   "It is well settled that 'a State cannot condition public employment on a basis that infringes the

17   employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*,

18   547 U.S. 410, 413 (2006) (*quoting Connick v. Meyers*, 461 U.S. 138, 142 (1983)). Generally, "[t]o

19   sustain a First Amendment retaliation claim, a public employee must show (1) the employee

20   engaged in constitutionally protected speech, (2) the employer took adverse employment action

21   against the employee, and (3) the employee's speech was a 'substantial or motivating' factor in the

22   adverse action." *Posey v. Lake Pend Oreille School District No. 84*, 546 F.3d 1121, 1126 (9th Cir.

23   2008) (*quoting Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006)).

24          Noting that "First Amendment retaliation law has evolved dramatically, if somewhat

25   inconsistently," the Ninth Circuit recently clarified and explained the appropriate approach to

26

1   assessing a First Amendment retaliation claim.  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.

2   2009).  In doing so, the court outlined the following sequential, five-step series of questions to be

3   answered in a First Amendment retaliation case: (1) whether the plaintiff spoke on a matter of

4   public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether

5   the plaintiff's protected speech was a substantial or motivating factor in an adverse employment

6   action; (4) whether the state had an adequate justification for treating the employee differently from

7   other members of the general public; and (5) whether the state would have taken the adverse

8   employment action even absent the protected speech.  *Id.*  The court will address these questions

9   below.

10          **A.  Matter of Public Concern**

11          To determine if an employee's speech addresses a matter of public concern, courts look at

12   the "content, form and context of a given statement, as revealed by the whole record."  *Connick*,

13   461 U.S. at 147-48.  "If employee expression relates to an issue of 'political, social, or other

14   concern to the community,' it may fairly be said to be of public concern."  *Brewster v. Lynwood*

15   *Unified Sch. Dist.*, 149 F.3d 971, 978 (9th Cir. 1998) (*quoting Connick*, 461 U.S. at 146).  "On the

16   other hand, speech that deals with 'individual personnel disputes and grievances' and that would be

17   of 'no relevance to the public's evaluation of the performance of governmental agencies is

18   generally not of 'public concern.'"  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

19   Determining whether the speech at issue touched on a matter of public concern is purely a question

20   of law properly decided on summary judgment.  *Posey*, 546 F.3d at 1126 (citations omitted).

21          Plaintiff argues the speech at issue here addressed a matter of public concern because the

22   speech "involved public safety and the proper management of a public agency."  (Pl.'s Opp. Mot.

23   Summ. J. (#76) at 6.)  In particular, Plaintiff maintains that he engaged in the following protected

24   speech: (1) complaining to Defendants Biaggi, Anderson, Ashworth, Dondero and Cannizarro,

25   directly and through his supervisor, Chief Pilot Pat Ross, that limiting the availability of air

26

operations to suppress fires was a danger to natural resources and to the lives, safety, and property of citizens; (2) complaining about the Bureau of Land Management's decision to wait until the fire season before conducting inspections concerning pilot qualifications and airworthiness of aircrafts; (3) on July 5, 2005, submitting a witness statement complaining about a lack of interagency cooperation that would harm the citizens of Nevada; (4) on or about June 28, 2005,[4] submitting a memorandum objecting to the "phasing out" of the air operations program and "delineating a lack of communication with air operations by management, [including the individual Defendants], reported bad employee morale, reported inconsistent decision making, reported lack of utilization, and requested an investigation into these matters"; and (5) on August 15, 2004, requesting an investigation from Defendant Anderson.  (Pl.'s Opp. Mot. Summ. J. (#76), Decl. of Glenn Marr.)

In assessing whether the speech at issue addressed matters of public concern, the court will analyze each of the above-cited instances separately.  In analyzing the speech, the court will primarily consider the content of the speech.  Nonetheless, although the content of Plaintiff's speech occupies the place of primary importance in the court's analysis, the form and context of Plaintiff's speech are also relevant to the court's assessment of whether the First Amendment protects the speech.  *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) (citation omitted).  In the analysis of form and context, the court focuses on the purpose of the speech, and considers such factors as the employee's motivation and the audience chosen for the speech.  *Id.* (citation omitted).

///

///

///

///

---

[4] In his declaration Plaintiff states that he submitted this memorandum to investigators on July 5, 2005. However, the evidence indicates that Plaintiff submitted the memorandum to Pat Ross sometime on before June 28, 2005, and Pat Ross provided a copy of the memorandum to Defendant Cannizzaro on June 28, 2005.

1        **1.      Informal, Undocumented Complaints**

2        First, Plaintiff maintains that beginning in February of 2005, he complained to Defendants

3   regarding an alleged plan to reduce the number of pilots and pilot hours during fire season.[5]  In

4   particular, Plaintiff maintains that he complained about such a reduction's threat to the natural

5   resources and to the lives, safety, and property of the citizens of the State of Nevada.  (Pl.'s Opp.

6   Mot. Summ. J. (#76), Decl. of Glenn Marr.)

7        With regard to the content of speech, "an opinion about the preparedness of a vital public-

8   safety institution, such as a fire department, goes to the core of what constitutes speech on matters

9   of public concern."  *Gibrook v. City of Westminister*, 177 F.3d 839, 866 (9th Cir. 1999).

10  (finding that speech concerning the fire department's ability to respond effectively to life-

11  threatening emergencies addressed a matter of public concern).  Similarly, speech relating to the

12  functioning of the government can address a matter of public concern.  *Posey*, 546 F.3d at 1130

13  (*citing Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995)).

14       For instance, in *Hyland v. Wonder*, the Ninth Circuit held the plaintiff's statements to

15  address matters of public concern where the speech at issue "exposed abuses, inefficiency, threats

16  to public safety, potential civil rights violations, and incompetence of public law enforcement

17  officials at Juvenile Hall."  972 F.2d 1129, 1137 (9th Cir. 1992).  The court noted that these issues

18  are of "vital interest to citizens in evaluating the performance of their government."  *Id.*  The court

19  concluded that this speech was a "classic topic of public concern - the inept, inefficient, and

20  potentially harmful administration of a governmental entity."  *Id.* at 1139.

21       In *Roth v. Veteran's Admin.*, the Ninth Circuit found similar speech to constitute speech on

22

23       [5] Defendants deny ever receiving or hearing of such complaints.  However, whether Defendants
     actually knew of the complaints has no bearing on whether the speech addressed a matter of public concern.
24   Defendants also deny ever considering a plan to reduce the number of pilots or pilot flight hours during the fire
     season.  However, even if Plaintiff's allegations regarding the existence of such a plan prove to be erroneous,
25   his speech can nonetheless constitute speech of public concern.  *See Thomas v. City of Beaverton*, 379 F.3d 802,
     809 (9th Cir. 2004) (citations omitted) (noting that the plaintiff's accusations of unlawful conduct need not have
26   been true to be protected expression).

                                                    9

a matter of public concern.  856 F.2d, 1401, 1405, *rev'd on other grounds*, 547 U.S. 410 (2006).

There, the court found plaintiff's speech indicating that Veteran's Administration personnel "acted

unethically," "mismanaged personnel," "violated safety regulations," and "put people in jeopardy"

to be "inherently of interest to the public."  856 F.2d at 1405.

Here, Plaintiff's complaints questioned Defendants' management decisions and attacked the

preparedness of the Division of Forestry, a public-safety institution charged with providing wild

land fire protection to the State of Nevada.  As in the above-cited cases, this speech addresses the

kind of concerns with public safety and the proper management of government that are inherently

in the public concern.

Similarly, the of context Plaintiff's speech indicates that the speech was in the public

concern.  Although Plaintiff engaged in the speech at issue through internal complaints, "[t]hat [the

employee] expressed his views inside his office, rather than publicly, is not dispositive."  *Garcetti*,

547 U.S. at 420 (citations omitted).  Plaintiff complained prior to his placement on administrative

leave and before his conduct came under scrutiny.  However, the complaints challenge the

proposed reduction of pilots and pilot hours, which would directly affect Plaintiff's employment.

Nonetheless, viewed in the light most favorable to Plaintiff, Plaintiff's motivations at least in part

appears to have been out of a concern for public safety.  Accordingly, based on the content and

context of the speech, the court finds that Plaintiff's alleged complaints addressed matters of public

concern.

**2.      Statements on June 27, 2005**

Plaintiff next argues that on June 27, 2005, when he inquired into the timing of the

inspection of the aircrafts and pilots, he engaged in speech addressing a matter of public concern.

Specifically, Plaintiff points to his questions to Defendant Wulfkuhle regarding why the Bureau of

Land Management had waited until fire season to conduct these inspections.  (Pl.'s Opp. Mot.

Summ. J. (#76), Decl. of Glenn Marr.)

10

Arguably, speech questioning the adequacy of inspections could address a matter of public concern.  Such speech would challenge the agency's management decisions and ultimately would go to the safety of the aircrafts and pilots charged with providing fire protection to the land and citizens of Nevada.

However, the speech at issue here does not challenge the adequacy of inspections.  Instead, the speech challenges the duplicative nature of the inspections.  There is no evidence, and Plaintiff does not allege, that the Bureau of Land Management had sole responsibility for verifying the safety of the aircrafts and pilots or that the federal agency missed a deadline to conduct the inspections.  Instead, Plaintiff admits that at least one other agency had inspected and approved the aircrafts and pilots in May of 2005, prior to the Bureau of Land Management's inspection.

Moreover, the context of Plaintiff's statements is telling.  Plaintiff made his comments in response to the inspection of Plaintiff's aircraft and Plaintiff's flight preparedness.  There is no evidence indicating that Plaintiff spoke out about problems with the inspections until his own conduct came under scrutiny.  Thus, it appears that Plaintiff spoke not out of concern for the public, but instead out of his own self interest.  Accordingly, the court finds that this speech was not in the public concern.

### 3.    Witness Statement

On July 5, 2005, Plaintiff submitted a witness statement discussing the June 27, 2005, incident and complaining about a lack of cooperation between the Nevada Division of Forestry, the Bureau of Land Management, the United States Forest Service, and the Office of Aircraft Services. (Defs.' Mot. Summ. J. (#65), Ex. 8.)  In the statement, Plaintiff asserts that the lack of interagency cooperation demonstrated a "blatant disregard for the citizens of the State of Nevada, placing them in greater harm than they would be otherwise."  (*Id.*)

Like Plaintiff's complaints about the potential reduction in pilots and pilot hours, the witness statement addresses the effect of the agencies' management and operations on the well

being of the public.  Although Plaintiff submitted the statement after being placed on

administrative leave, this fact is not dispositive.  The court finds it particularly significant that these

agencies are charged with providing fire protection to the environment and citizens of Nevada, a

vital public safety function.  While Plaintiff's concern with the mismanagement of the various

agencies may be an attempt to salvage his own position in the Division of Forestry, at least part of

the witness statement directly addresses Plaintiff's concern with the effect of potential

mismanagement on the safety of the public. This type of threat to the public safety is the type of

speech inherently in the public interest.

### 4.    Memorandum

Plaintiff also identifies as protected speech a memorandum he submitted to Pat Ross

objecting to the "phasing out" of the air operations program and "delineating a lack of

communication with air operations by management, [including the individual Defendants], reported

bad employee morale, reported inconsistent decision making, reported lack of utilization, and

requested an investigation into these matters."  (Pl.'s Opp. Mot. Summ. J. (#76), Decl. of Glenn

Marr.).

The court finds that Plaintiff's memorandum does not address a matter of public concern.

Although the speech attacks the management of a government agency, the speech does not expose

the type of abuses, ineptitude, or incompetence necessary to bring the speech within the public

concern.  Instead, the speech involves the type of individual "personnel disputes and grievances and

that would be of no relevance to the public's evaluation of the performance of governmental

agencies' is generally not of public concern." *Coszalter*, 320 F.3d at 973.

For example, rather than addressing specific concerns relating to the public's well being, the

memorandum focuses on the effect of Plaintiff's enumerated complaints on his own employment

and states, "[the Division of Forestry] will have to lay me off for three months because of

insufficient non-fire flight time."  (Defs.' Mot. Summ. J. (#65), Ex. 1.)   In addition, it appears that

1    Plaintiff submitted the memorandum on June 28, 2005, the day following the incident with

2    Defendant Wulfkuhle.  Thus, the memorandum appears to be a reaction to the incident with

3    Defendant Wulfkuhle rather than an expression of Plaintiff's genuine concern for the public interest

4    in the agency's management.  Accordingly, the court finds as a matter of law that the speech does

5    not address matters of public concern.

6                    **5.       Investigation Request**

7            Finally, Plaintiff maintains that his request for an investigation on August 15, 2004,

8    constitutes speech address a matter of public concern.  However, Plaintiff has not provided any

9    evidence indicating why he requested the investigation or what he sought to be investigated.

10   Accordingly, the court cannot find that the investigation request qualifies as speech addressing a

11   matter of public concern.

12           **B.  Plaintiff's Capacity as a Private Citizen or Public Employee**

13           To summarize, the court has concluded that the following two statements addressed matters

14   of public concern: (1) Plaintiff's complaints regard the availability of pilots and (2) Plaintiff's July

15   5, 2005, witness statement.  The court next considers whether the plaintiff made these statements as

16   a private citizen or as a public employee. *Eng*, 552 F.3d at 1070.  The plaintiff bears the burden of

17   showing the speech was spoken in his capacity as a private citizen and not a public employee. *Id.*

18   at 1071 *(citing Garcetti*, 5647 U.S. at 421-22; *Posey*, 546 F.3d at 1126-27).  "Statements are made

19   in the speaker's capacity as citizen if the speaker had no official duty to make the questioned

20   statements, or if the speech was not the product of performing the tasks the employee was paid to

21   perform." *Id.* (*quoting Posey*, 546 F.3d at 1127 n.2).

22           Determining whether the plaintiff spoke as a public employee or as a private citizen

23   presents a mixed question of law and fact. *Posey*, 546 F.3d at 1129.  Thus, the "scope and content

24   of a plaintiff's job responsibilities can and should be found by a trier of fact," but the "ultimate

25   constitutional significance of the facts as found" is a question of law. *Id.* at 1129-30.  "When there

26                                        13

1    are genuine and material disputes as to the scope and content of the plaintiff's job responsibilities,

2    the court must reserve judgment on this . . . prong of the protected status inquiry until after the fact-

3    finding process." *Id.* at 1131.

4          The court finds that Plaintiff has demonstrated material issues of fact concerning whether he

5    made the statements as a public citizen.  Defendants fail to present any evidence relating to

6    Plaintiff's employment responsibilities.  The only evidence in the record relating to Plaintiff's

7    employment responsibilities is a list made by Plaintiff listing his job duties.  (Pl.'s Opp. Mot.

8    Summ. J. (#76), Ex. 2.)  Plaintiff compiled the list by referencing his job description when hired,

9    work performance standards, and the assignments he had received.  (*Id.*)  Plaintiff presented the list

10   at the hearing on the appeal of his termination.  (*Id.*, Decl. of Jeffrey Dickerson, Ex. 2.)  The list

11   makes no mention of reporting or oversight duties of any kind.

12         Moreover, in the statements at issue, Plaintiff criticizes what he believed to be Defendants'

13   poor decision making.  Defendants have pointed to no official duty requiring Plaintiff to identify

14   and report such problems and making such criticism is certainly not what the Division of Forestry

15   hired Plaintiff, a pilot, to do.  Accordingly, viewing the evidence in the light most favorable to

16   Plaintiff, the court finds that there are genuine issues of material fact concerning whether Plaintiff

17   made the statements as a citizen or pursuant to his official duties.

18         **C.  Adverse Employment Action**

19         Under the third prong of the retaliation inquiry, the plaintiff must demonstrate that the state

20   took an adverse employment action and that the plaintiff's speech was a substantial or motivating

21   factor in the adverse action.  *Eng*, 552 F.3d at 1071 (*citing Freitag v. Ayers*, 468 F.3d 528, 543 (9th

22   Cir. 2006)).  Defendants do not appear to dispute that Plaintiff suffered adverse employment

23   actions when he was placed on administrative leave and when his employment was terminated.

24   Instead, Defendants maintain Plaintiff has failed to provide any evidence indicating that Plaintiff's

25   speech played a substantial or motivating factor in the adverse employment actions.

26

"Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in light of the timing and surrounding circumstances." *Coszalter*, 320 F.3d at 978. As a threshold matter, to establish a genuine and material dispute as to whether the speech was a substantial or motivating factor in the adverse action, the plaintiff must first provide evidence indicating that the defendant was aware of the plaintiff's expressive conduct. *Alpha Energy Savers v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004). Once the plaintiff has established the requisite awareness, the Ninth Circuit has identified three ways by which a plaintiff can show that retaliation was a substantial or motivating factor behind an adverse employment action. *Coszalter*, 320 F.3d at 977 (*citing Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001)). First, a plaintiff can show that the proximity in time between the protected speech and the allegedly retaliatory employment decision gives rise to an inference that the plaintiff was terminated in retaliation for her speech. *Id.* (*citing Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988)). Second, a plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id.* (*citing Keyser*, 265 F.3d at 751). Third, "the plaintiff can introduce evidence that his employer's proffered explanations for the adverse employment action were false and pre-textual." *Id.* (*citing Keyser*, 265 F.3d at 751).

In considering whether Plaintiff's speech was a substantial or motivating factor in the adverse employment actions, the individual role of each Defendant is significant. Defendant Anderson is the individual responsible for the decision to place Plaintiff on administrative leave and to terminate him. The remaining Defendants primarily are subordinates who in some way may have contributed to the adverse employment decisions.[6]

As the Ninth Circuit recently noted, most of the circuit's retaliatory motive jurisprudence has involved cases in which the final decision maker was charged with the retaliatory conduct,

---

[6] Defendant Biaggi is not a subordinate and is arguably the ultimate decision maker because he affirmed Defendant Anderson's termination decision. Regardless, the court addresses his liability below.

15

either because the decision maker was retaliating against the employee or because the retaliatory

motive of a subordinate tainted the decision. *Lakeside-Scott*, ___F.3d ___, 2009 WL 33145, at *5.

Nonetheless, "personal participation is not the only predicate for section 1983 liability. Anyone

who 'causes' any citizen to be subjected to a constitutional deprivation is also liable." *Gilbrook*,

177 F.3d at 854 (*quoting Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). In *Gilbrook* the

court held that a "subordinate cannot use the non-retaliatory motive of a superior as a shield against

liability if that superior never would have considered the [adverse action] but for the subordinate's

retaliatory conduct." *Id.* at 855.

The court will first consider Defendant Anderson's role in the adverse employment actions.

There are two separate theories upon which Defendant Anderson's liability might rest. First,

Defendant Anderson could have intentionally retaliated against Plaintiff for his complaints.

Second, even if Defendant Anderson lacked a retaliatory motive, if Defendant Anderson relied

upon the information of a subordinate with a retaliatory motive and the motive tainted Defendant

Anderson's decision, the subordinate's animus can be imputed to Defendant Anderson. *See

Lakeside-Scott v. Multnomah County*, ____ F.3d ____ , 2009 WL 331460, at *5 (9th Cir. Feb. 12,

2009). The court will consider each of these theories of liability. As discussed below, the

determination of Defendant Anderson's liability also dispenses with the liability of the remaining

Defendants.

### 1.    Intentional Retaliation

As noted, to establish a genuine, material dispute as to whether the speech was a substantial

or motivating factor in the adverse action, the plaintiff must first provide evidence indicating that

the defendant was aware of the plaintiff's expressive conduct. *Alpha Energy Savers*, 381 F.3d at

929. With regard to Plaintiff's termination, Defendant Anderson does not appear to dispute that

once the investigation began, he possessed knowledge of Plaintiff's alleged complaints and the

witness statement submitted July 5, 2005. With regard to Plaintiff's placement on administrative

16

leave, Defendant Anderson maintains that he had no knowledge of Plaintiff's complaints prior to placing Plaintiff on administrative leave.  (Defs.' Mot. Summ. J. (#65), Ex. 4.)   In contrast, Plaintiff maintains that he made the complaints to each Defendant, including Defendant Anderson, beginning in February of 2005.  (Pl's. Opp. Mot. Summ. J. (#76), Decl. of Glenn Marr.)  Although Plaintiff's evidence is uncorroborated, viewed in the light most favorable to Plaintiff, there is a genuine issue of material fact concerning whether Defendant Anderson was aware of Plaintiff's complaints prior to placing Plaintiff on administrative leave.

Turning to the timing and circumstances surrounding the adverse employment actions, Plaintiff first contends that the timing of the complaints gives rise to an inference that in retaliation for his speech Defendant Anderson placed him on administrative leave and terminated him. Plaintiff began making his complaints in February of 2005 and submitted his witness statement in early July of 2005.  Plaintiff was terminated in October of 2005.  Thus, a period of approximately eight months and a period of approximately three months, respectively, lapsed between Plaintiff's statements and his termination.  Three to eight months is "easily within a time range that can support an inference of retaliation." *Coszalter*, 320 F.3d at 977 (discussing a time range of three to eight months as easily fitting within the a questionable time range).

In terms of the veracity of Defendant Anderson's stated reasons for terminating Plaintiff, Defendant Anderson maintains that he placed Plaintiff on administrative leave in response to what he viewed as inappropriate behavior during the incident with Defendant Wulfkuhle and ultimately terminated Plaintiff after a thorough investigation that uncovered discrepancies in Plaintiff's flight time and training hours.  In contrast, Plaintiff argues that Defendant Anderson used the incident with Defendant Wulfkuhle and the subsequent investigation as a pretext for terminating him because of his speech.

In support of this contention, Plaintiff first claims that until Defendant Wulfkuhle and the other state and federal agents came to the hangar on June 27, 2005, (1) state and federal officials

had never come to the hangar together, (2) federal agencies had always accepted the certification of other federal agencies' flight inspections, (3) a federal agent had never indicated that an inspection was required because of "past problems," (4) Defendant Mendenhall had never questioned Plaintiff's flight hours, and (5) Defendants had never accused Plaintiff of accosting a federal official.[7]  (Pl.'s Opp. Mot. Summ. J. (#76), Decl. of Pl.)

While this evidence indicates that new inspection procedures may have been instituted, there is no evidence in the record indicating that Defendant Anderson played any role in the creation, implementation, or enforcement of these inspection procedures or in the inspection that occurred on June 27, 2005.  Without some connection between the allegedly unfounded inspection and Defendant Anderson, no reasonable jury could infer from the inspection that Defendant Anderson possessed a retaliatory motive.  To the contrary, there is evidence in the record supporting Defendant Anderson's finding that Plaintiff acted inappropriately during the encounter.

Plaintiff also cites the deposition of Jan Kyle, who testified that on June 27, 2005, she heard a federal employee, Gary Brennan, say to Defendant Wulfkuhle, "We're gonna teach these boys a lesson." (Pl.'s Opp. Mot. Summ. J. (#67), Ex. 4.)  Ms. Kyle believed that "these boys" referred to Plaintiff, among other individuals.  (*Id.*)  Although Ms. Kyle submitted a statement to Defendant Anderson relaying what she heard and observed, Plaintiff has not cited to any evidence connecting Defendant Anderson to this statement.  Absent evidence indicating that Defendant Anderson himself was involved in the conversation or a part of such agreement, the statement does not provide any indication that Defendant Anderson possessed a retaliatory motive.

"Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in light of the timing and the surrounding circumstances." *Coszalter*, 320

---

[7] Plaintiff also claims that his conversation with Defendant Wulfkuhle did not become aggressive or heated. However, in the termination proceedings Plaintiff admitted that he "probably raised [his] voice towards the end of [the conversation] when [Defendant Wulfkuhle] kept being evasive and not willing to answer [his] questions."  (Defs.' Reply (#79), Ex. 2.)

F.3d at 978.  In this case, the timing of Plaintiff's statements and the adverse actions arguably gives rise to an inference of retaliation.  However, "the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment [in the plaintiff's favor]."  *Id.*  Beyond timing, there is no additional evidence in the record indicating that Defendant Anderson possessed a retaliatory motive.

Thus, even when the court views the evidence in the light most favorable to Plaintiff, Plaintiff has failed to raise genuine issues of material fact concerning whether his complaints played a substantial or motivating role in Defendant Anderson's decision to place him on administrative leave and to terminate him.  Defendant Anderson placed Plaintiff on administrative leave in response to what he viewed as inappropriate behavior during the incident with Defendant Wulfkuhle and ultimately terminated Plaintiff after a thorough investigation.  Beyond the timing of the speech and the adverse actions, Plaintiff has cited to no other evidence indicating that Defendant Anderson possessed a retaliatory motive.  Accordingly, the court finds that no reasonable jury could conclude, based on evidence before the court, that Plaintiff's speech played a substantial or motivating role in Defendant Anderson's decision to place Plaintiff on administrative leave and ultimately to terminate Plaintiff.

## 2.    Imputed Retaliation

Even if Defendant Anderson himself did not possess a retaliatory motive, Defendant Anderson may still be liable if his decision was tainted by the retaliatory motive of a subordinate. "If a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decision maker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decision making process."  *Poland v. Chertoff*, 494 F.3d 1174,

1   1182 (9th Cir. 2007).[8]

2       Here, several individuals were involved in the investigation that culminated in Plaintiff's

3   termination.  Defendant Biaggi, as the Director of the Nevada Department of Conservation and

4   Natural Resources, affirmed the decision to terminate Plaintiff.  Defendants Dondero, Ashworth

5   and Cannizarro were present for the incident at the hangar on June 27, 2005, and each prepared

6   witness statements or spoke with Defendant Anderson regarding the incident.  (Pl.'s Opp. Mot.

7   Summ. J. (#67), Ex. 6; Defs.' Mot. Summ. J. (#65), Ex. 6.)  Defendant Cannizarro was also a

8   member of the investigation team and uncovered the discrepancies in Plaintiff's training hours.

9       Plaintiff has failed to identify evidence suggesting that any subordinate, including

10  Defendants, possessed a retaliatory motive.  Contrary to Plaintiff's assertions, the evidence

11  indicates that in the course of conducting their investigation Defendants uncovered discrepancies in

12  Plaintiff's flight and training records.  Moreover, although new inspection procedures may have

13  been put in place or even selectively enforced, there is no evidence in the record identifying any

14  individual, including Defendants, who played a role in creating, implementing, or enforcing the

15  new inspection procedures.  Similarly, the evidence does not indicate a connection between any

16  subordinate involved in the adverse actions and the conversation between federal employees

17  overheard by Jan Kyle.

18      Plaintiff also implies that because Defendant Cannizarro witnessed the June 27, 2005,

19  incident, it was improper for him to be on the investigation team.  However, absent evidence

20  indicating that Defendant Cannizarro possessed some animus toward Plaintiff, the court does not

21  view this as significant.  Similarly, in his declaration Plaintiff states that prior to the investigation

22  Defendant Biaggi held a meeting in which he said someone was going to be terminated over "the

23  incident."  However, Plaintiff has provided no evidence indicating on what day the meeting was

24  _____

25      [8] Although *Poland* involved a claim brought under the Age Discrimination in Employment Act rather
    than under § 1983, the Ninth Circuit has cited the case and other cases brought under the Act for their

26  informative discussions about causation.  *See Lakeside-Scott*, ___F.3d ___, 2009 WL 33145, at *5 n.8.

20

1   held, who was present, or to what or to whom the statement referred.  Without such information,

2   there can be no inference of a retaliatory motive from the statement.

3          The court finds that based on the evidence in the record no reasonable jury could conclude

4   that Defendants Biaggi, Ashworth, Dondero, and Cannizarro possessed retaliatory motives.

5   Accordingly, summary judgment with regard to Plaintiff's First Amendment retaliation claims

6   against these Defendants is appropriate.  In addition, because these Defendants and other

7   subordinates lacked retaliatory motives, their unlawful motives cannot be imputed onto Defendant

8   Anderson.  Thus, summary judgment with regard to Plaintiff's First Amendment retaliation claims

9   against Defendant Anderson is also appropriate.

10  **IV.    Conspiracy**

11         In addition to the retaliation claim, Plaintiff's complaint also sets forth a cause of action for

12  civil conspiracy pursuant to 42 U.S.C. § 1983.  (Second Am. Compl. (# 23) ¶ 5.)  In particular,

13  Plaintiff alleges that the inspection on June 27, 2005, was the "result of a conspiracy between the

14  named Defendants to create a confrontation with Plaintiff that would justify termination."  (Second

15  Am. Compl. (#23) ¶18.)

16         To establish a violation of § 1983, a plaintiff must demonstrate the following: (1) the

17  defendants have acted under color of state law; and (2) the defendants have deprived the plaintiff

18  of a right, privilege, or immunity secured by the Constitution and laws of the United states.  *Sykes v.*

19  *California*, 497 F.2d 197, 199-200 (9th Cir. 1974) (*citing Cohen v. Norris*, 300 F.2d 24, 30 (9th

20  Cir. 1962)).  In addition, to establish a conspiracy pursuant to § 1983, the plaintiff must show an

21  agreement or meeting of minds to violate his constitutional rights and an overt act in furtherance of

22  the conspiracy.  *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (*citing United Steelworkers of*

23  *Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989)); *Woodrum v. Woodward*

24  *County, Oklahoma*, 866 F.2d 1121, 1126 (9th Cir. 1989) (*citing Fonda v. Gray*, 707 F.2d 435 (9th

25  Cir. 1983)); *Sykes*, 497 F.2d at 200 (citation omitted).  The alleged conspiracy must result in an

26

21

actual deprivation of a constitutional right.  *Woodrum*, 866 F.2d at 1126 (*citing Hoffman v. Halden*, 268 F.2d 280, 293 (9th Cir. 1959), *rev'd on other grounds*, 300 F.2d at 30 (1962)).

Plaintiff bases his retaliation claim on the deprivation of his First Amendment right to speech.  As discussed above, Plaintiff has failed to make the necessary showing to support the deprivation of this constitutional right.  Accordingly, Plaintiff's conspiracy claim fails.  The court will grant summary judgment with regard to the conspiracy claim.

**V.    Qualified Immunity**

Finally, Defendants argue that they are entitled to qualified immunity.  Qualified immunity protects state officials from civil liability for damages resulting from discretionary acts, so long as those acts do not violate clearly established constitutional or statutory rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, U.S. 800, 917-18 (1982).  Qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation" and is an appropriate basis for granting summary judgment.  *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001) (citations omitted).

In  *Saucier*, the Supreme Court established a two-step evaluation of qualified immunity, which has also been adopted by the Ninth Circuit.  *See, e.g.*, *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003); *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). The first step in the qualified immunity analysis is to determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated the plaintiff's constitutional rights.  *Saucier*, 533 U.S. at 201.  If there is no constitutional violation, then the officer is entitled to qualified immunity.  *Id.*  However, if the court finds that a constitutional violation has been established, the second step of the *Saucier* analysis requires the court to determine whether the constitutional right was clearly established at the time of the violation.  *Id.*  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Id.* at 202.

Here, Plaintiff has failed to establish a violation of a constitutional right.  Absent a

1  constitutional violation, Defendants are entitled to qualified immunity.  Accordingly, summary

2  judgment is appropriate.

3        IT IS THEREFORE ORDERED that Defendants Anderson, Biaggi, Ashworth, Cannizarro,

4  and Dondero's Motion for Summary Judgment (#65) is hereby GRANTED.

5        The Clerk of the court shall enter judgment accordingly.

6        Pursuant to this court's previous order (#73) the Clerk shall also enter judgment as to

7  Defendants Mendenhall and Wulfkuhle.

8        IT IS SO ORDERED.

9        DATED this 25th day of February, 2009.

10

11

12                                  _____
                                LARRY R. HICKS
                                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26